

FILED

Sep 24 2015, 9:24 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT

Russell B. Cate
Casandra J. Nelson
Campbell Kyle Proffitt, LLP
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Karl M. Scharnberg
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kristy Burnell,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 24, 2015

Court of Appeals Case No.
29A02-1412-CR-849

Appeal from the Hamilton Superior
Court

Trial Court Cause No.
29D06-1407-F6-5545

The Honorable Gail Z. Bardach,
Judge

**Pyle, Judge.**

[1] Kristy Burnell ("Burnell") appeals the trial court's determination that she refused a certified chemical test during a traffic stop, which resulted in the suspension of her driving privileges pursuant to Indiana's Implied Consent Law. On appeal, she argues that she consented to take the test and that her conduct was not tantamount to a refusal. We affirm the trial court's order,

holding, as a matter of first impression, that any answer short of an unqualified, unequivocal assent to a properly offered certified chemical test constitutes a refusal.

[2] Affirmed.

# Issue

Whether the trial court erred in determining that Burnell refused a certified chemical test under Indiana's Implied Consent Law.

# Facts

[3] On July 3, 2014, Officer Dave Kinyon ("Officer Kinyon"), with the Carmel Police Department, observed Burnell driving her car on Carmel Drive in Hamilton County. Burnell ran a stop sign and made an improper turn, and Officer Kinyon, along with two other officers, conducted a traffic stop.

[4] Officer Kinyon noticed an odor of an alcoholic beverage coming from Burnell. He also noticed that her speech was slurred, her eyes were bloodshot, and her balance was unsteady. Officer Kinyon performed a number of field sobriety tests on Burnell. The field sobriety tests were recorded by Officer Kinyon's in-car video system. Burnell failed every test. After the field sobriety tests, the following colloquy took place between Burnell and Officer Kinyon:

> Officer Kinyon: I do have probable cause to believe that you
> have operated a motor vehicle while intoxicated and I must now
> offer you the opportunity to take a chemical test, and inform you
> that your refusal to take a chemical test will result in a suspension
> of your driving privileges for one year. If you have at least one
> previous conviction for operating while intoxicated, your refusal

to submit to a chemical test will result in a suspension of your driving privileges for two years. Will you now take that chemical test?

Burnell: I don't know. I—I—I would really prefer it if you could call my uncle.

Officer Kinyon: This is something—you're an adult—this is something that you need to handle on your own. Okay. I need a yes or no.

Burnell: Yeah, yeah but—I'm and [sic] adult, but, I—I

Officer Kinyon: Okay Kristy, I'm going to explain something to you, okay. I'm a relatively patient person, but this is one of [sic] circumstances where I don't have a lot of patience.

Burnell: I can't get [sic] have another one . . .

Officer Kinyon: So I need—I need you to get—I need to get—a certain . . .

Burnell: I got in trouble like two years ago.

Officer Kinyon: I need to—So you've [] had an OWI before?

Burnell: Two years ago. Yeah.

Officer Kinyon: Was that here in Indiana or was that down in Florida.

Burnell: No. It was—it was in—in Palm Beach.

Officer Kinyon: In Palm Beach? Well—

Burnell: Bruce is my uncle, and he's my best friend.

Officer Kinyon: I understand that. You've told me that several times.

Burnell: I don't even—I don't even drink and drive. I've had two fucking beers.

Officer Kinyon: Okay, so I need an answer. Are you willing to take the test or not? Okay?

Burnell: Well, I mean if I take it, I'm going to jail.

> Officer Kinyon: I'm not going to argue with you. But I need a yes or no answer. You have the right to refuse, but I need an answer as to whether you'll take that test or not. And that's something I'm not—
>
> Burnell: Well if I refuse, I'm going to jail either way. So yeah, I guess I gotta take it.

(Tr. 22-25; App. 10)

[5] At this point, Burnell then began to walk away from Officer Kinyon, and he grabbed her arm to stop her. She told him not to touch her and began moving away from the officer again. Officer Kinyon, along with an assisting officer, grabbed Burnell and placed her in handcuffs. Officer Kinyon deemed her behavior as a refusal to submit to the chemical test, and placed her under arrest.

[6] On July 9, 2014, the State charged Burnell with operating a vehicle while intoxicated with a prior conviction within the previous five years as a Level 6 felony. On July 22, 2014, the trial court suspended her license for refusing the chemical test. Burnell filed a petition for judicial review of the suspension on October 2, 2014.

[7] The trial court conducted a hearing on November 14, 2014. During the hearing, both parties agreed that there was probable cause to offer a chemical test, and the only dispute was whether Burnell had refused the test. Officer Kinyon testified, and video from his in-car police camera was played for the trial court. After considering the evidence, the trial court ruled from the bench as follows:

Well, the words as [the defense relates] them are very neutral, very passive, very non-argumentative. The transcript that you offered to let me read instead of viewing the video would have left that impression in my mind that what was happening out there was very neutral, very passive, very ordinary. That's not what I saw in the video, however. She did say the words, "I gotta take it" and she did walk away from him at the same time. It looked to me like she put his—put her hands on him. It was at that point that the other officer stepped in and put cuffs on her. No, she wasn't jumping up and down. No she wasn't belligerent, but she wouldn't stop interrupting him. She kept referring to her uncle the police officer, her best friend. She obviously wanted to argue with [the arresting officer], and was arguing with him. I consider her response to be very equivocal, certainly not something that was indicative of only one meaning.

As the officer testified, he was responding to the totality of the circumstances. And the totality of the circumstances were that she was arguing with him. She was pleading with him to contact her police officer uncle. She was walking away from him. She appeared to be, from my perspective in any event, putting her hands on him, and at that point she was put into cuffs and placed under arrest. I'm not going to terminate the refusal suspension. I believe that the officer was appropriate in determining her behavior to constitute a refusal.

(Tr. 32-33). Burnell now appeals the denial of her petition for judicial review.

# Discussion

[8] Burnell appeals the denial of her petition to reinstate her driver's license after the trial court suspended it for refusing a certified chemical test under Indiana's Implied Consent Law.

[9] A person who operates a motor vehicle impliedly consents to submit to a chemical test as a condition of operating a motor vehicle in Indiana. IND.

CODE § 9-30-6-1. When a law enforcement officer has probable cause to believe a motorist has operated a vehicle while intoxicated, the officer must offer the motorist an opportunity to submit to a chemical test. I.C. § 9-30-6-2(a). When an officer offers a motorist a chemical test, the officer must inform the motorist that a refusal will result in the suspension of his or her driving privileges. I.C. § 9-30-6-7(a).[1] Indiana's implied consent statutes provide the State with a mechanism necessary to obtain evidence of a driver's intoxication in order to keep Indiana streets, roads, and highways safe by removing the threat posed by the presence of drunk drivers. *Abney v. State*, 821 N.E.2d 375, 379 (Ind. 2005).

[10] A trial court's denial of a petition for judicial review of a chemical breath test refusal is a final appealable judgment. *See* I.C. § 9-30-6-10(g). On review, we can only determine whether the evidence is sufficient as a matter of law to support the findings that: (1) the arresting officer had probable cause to believe that the driver was operating a vehicle while intoxicated; and (2) the driver

---

[1] While there is no "official" implied consent warning, many officers—including Officer Kinyon here—use the same or something similar to the warning from *State v. Ray*, 886 N.E.2d 43, 45 (Ind. Ct. App. 2008):

> I have probable cause to believe that you've operated a vehicle while intoxicated. I must now offer you the opportunity to submit to a chemical test and inform you that your refusal to submit to a chemical test will result in a suspension of your driving privileges for one year. If you have at least one previous conviction for operating while intoxicated, your refusal to submit to a chemical test will result in a suspension of your driving privileges [for two years]. Will you now take a test?

refused to submit to a chemical test offered by a law enforcement officer after being informed of the consequences of such refusal. *Upchurch v. State*, 839 N.E.2d 1218, 1220 (Ind. Ct. App. 2005). In doing so, we will not weigh the evidence nor judge the credibility of the witnesses, and we will consider only the evidence favorable to the trial court's decision. *Id*.

[11] Here, Burnell does not challenge whether the officer had probable cause to believe that she had operated a vehicle while intoxicated. Rather, she claims that she agreed to take the test and that her subsequent conduct did not "negate her affirmative response." (Burnell's Br. 3). In response, the State essentially argues that Burnell's oral response to the implied consent advisement was equivocal and should be treated as a refusal.

[12] We have previously addressed whether a defendant's conduct established refusal of a certified chemical test. *Thacker v. State*, 441 N.E.2d 708, 711 (Ind. Ct. App. 1982) (finding that "recalcitrant behavior . . . which physically impedes or threatens to impede the administration of the test . . . constitutes refusal"). We have also found that feigning attempts to perform a certified breath test and equivocation by requesting counsel constitute refusal. *Hatch v. State*, 378 N.E.2d 949 (Ind. Ct. App. 1978); *Davis v. State*, 367 N.E.2d 1163 (Ind. Ct. App. 1977). However, the issue of equivocation alone when responding to an officer's request to take a chemical test appears to be one of first impression. *Davis* is instructive on this question.

[13] In *Davis*, we held for the first time in Indiana that the Sixth Amendment constitutional right to counsel did not attach at the time a motorist is offered a chemical test. The decision to take a breath test and the potential license suspension for a refusal were administrative in nature, not criminal. *Davis*, 367 N.E.2d at 1167. *Davis* relied in part on a case from New Jersey, *State v. Pandoli*, 262 A.2d 41 (N.J. Super. Ct. App. Div. 1970).

[14] There, after the defendant was given the implied consent advisement, he refused to take the test. *Id*. at 42. Later, he told an officer that he would take the test if he had to, but wanted to contact an attorney. *Id*. In interpreting New Jersey's implied consent statute and concluding that the defendant had refused the chemical test, the court stated the following:

> Having in mind the remedial purpose of the statute, and the rapidity with which the passage of time and the physiological processes tend to eliminate evidence of ingested alcohol in the system, it is sensible to construe the statute to mean that anything substantially short of an unqualified, unequivocal assent to an officer's request that the arrested motorist take the test constitutes a refusal to do so. The occasion is not one for debate, maneuver, or negotiation, but rather for a simple "yes" or "no" to the officer's request.

*Id*. (internal citation omitted). The question, then, is can we interpret Indiana's Implied Consent Law in such a manner that any answer short of "yes" or "no" to an officer's request constitutes a refusal.

[15] The cardinal rule in statutory construction is to determine and give effect to the true intent of the legislature. *Jacks v. State*, 853 N.E.2d 520, 522 (Ind. Ct. App. 2006). To do this, we interpret the statute according to the ordinary and plain meaning of the language used, absent a clearly manifested purpose to do otherwise. *Id*. Further, we presume that the legislature intended logical application of the language in the statute, so as to avoid unjust or absurd results. *State v. Evans*, 810 N.E.2d 335, 337 (Ind. 2004) (quoting *Bolin v. Wingert*, 764 N.E.2d 201, 204 (Ind. 2002)). Moreover, when interpreting the words of a statute, we must construe them with due regard for all other sections of the act and with regard for the legislative intent to carry out the spirit and purpose of the act. *N.D.F. v. State*, 775 N.E.2d 1085, 1088 (Ind. 2002).

[16] The implied consent statutes are aimed at providing law enforcement officers with implied consent for performing chemical tests on drivers who are either thought to be intoxicated or who have been involved in accidents involving fatalities or serious bodily injuries. *Brown v. State*, 744 N.E.2d 989, 993 (Ind. Ct. App. 2001). "A person who operates a vehicle impliedly consents to submit to [a] chemical test . . . as a condition of operating a vehicle in Indiana." I.C. § 9-30-6-1.

[17] Furthermore, INDIANA CODE § 9-30-6-2 provides the following:

> (a) A law enforcement officer who has probable cause to believe that a person has committed an offense under this chapter, IC 9-30-5 [operating a vehicle while intoxicated] . . . *shall* offer the person the opportunity to submit to a chemical test.

\* \* \* \* \*

> (c) A test administered under this chapter must be within three (3) hours after the law enforcement officer had probable cause to believe the person committed an offense under IC 9-30-5 or a violation under IC 9-30-15.
>
> (d) A person *must* submit to each chemical test offered by a law enforcement officer in order to comply with the implied consent law.

[18] (emphases added). The language of our implied consent law is clear. Once a person operates a vehicle in Indiana, they have impliedly or indirectly consented to take a properly offered chemical test. In addition, a motorist must submit to every chemical test offered to be in compliance with the statute. Finally, when an officer advises a motorist of the consequences of refusing a chemical test, the warning must be in "absolute terms." *State v. Ray*, 886 N.E.2d 43, 47-48 (Ind. Ct. App. 2008) (citing *State v. Huber*, 540 N.E.2d 140 (Ind. Ct. App. 1989), *trans. denied*) (implied consent statute mandated an advisement "that refusal *will* result in suspension").

[19] Just as an officer's implied consent advisement must unequivocally inform a motorist that his or her refusal *will* result in suspension of their driving privileges, a motorist's response must also be unequivocal to the proper offer of a chemical test. The statute as written leaves a motorist no room for negotiation or debate. Allowing any equivocal response from a motorist when confronted with a properly offered chemical test does not comport with the mandatory language of the statute or its purpose. Accordingly, we hold that

anything short of an unqualified, unequivocal assent to a properly offered chemical test constitutes a refusal.

[20] Turning to Burnell's response to Officer Kinyon's implied consent advisement, we note that she first answered that she did not know if she would take the test and asked the officer to call her uncle. When Officer Kinyon told her that he needed a yes or no answer, Burnell responded that if she refused she was going to jail "so yeah, I guess I gotta take it." (App. 10 at 20:49:22). She then began to walk away, and Officer Kinyon grabbed her arm and told her not to move. Burnell moved out of his grasp, told the officer not to touch her, and moved away again. Officers then placed her in handcuffs.

[21] Based upon this evidence, the trial court found that Burnell's answers and conduct did not equate to an "answer indicative of one meaning" and concluded that she had refused the chemical test. (Tr. 32-33). Burnell's claim that she agreed to the test when she said, "yeah I guess I gotta take it" is a request that we reweigh the evidence, which we will not do. *See Upchurch*, 839 N.E.2d at 1220. Accordingly, we affirm the trial court's order upholding her license suspension under Indiana's Implied Consent Law.

[22] Affirmed.

Crone, J., concurs in result with opinion.

Brown, J., dissents with opinion.

Kristy Burnell,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

Court of Appeals Case No.
29A02-1412-CR-849

**Crone, Judge, concurring in result.**

I agree with Judge Pyle's affirmance of the trial court's determination that Burnell refused a chemical test, but I do not believe that we need go so far as to categorically hold that "anything short of an unqualified, unequivocal assent to a properly offered chemical test constitutes a refusal." *Supra* at 11. Each case should be judged on its specific facts, and in my view the facts most favorable to the trial court's determination in this case are sufficient to affirm it.

I also write separately because this case raises some questions left unanswered by our supreme court's opinion in *Robinson v. State*, 5 N.E.3d 362 (Ind. 2014), regarding the proper standard for reviewing video evidence on appeal. In *Robinson*, the defendant was stopped for unsafe lane movement and charged with marijuana possession and operating while intoxicated. She filed a motion to suppress the evidence derived from the stop, arguing that the stop was not

supported by reasonable suspicion because her vehicle never left its lane. The trial court denied the motion and ultimately found her guilty, giving more credence to the testimony of arresting officer Deputy Claeys than to the video from his in-car camera.

[25] In affirming Robinson's convictions, our supreme court stated,

> Robinson argues Deputy Claeys lacked reasonable suspicion to stop her vehicle and thus violated her rights under both the federal and state constitutions. As a threshold matter, both parties dispute the significance of the video evidence. Robinson notes the trial court conceded the video "did not clearly demonstrate that Robinson's vehicle veered off the roadway … but speculated that the officer's observations at the scene were superior to his in-car camera." The State, on the other hand, cautions us not to "rest [our] determination on minutia of an imperfect and rudimentary video."
>
> While technology marches on, the appellate standard of review remains constant. [W]e do not reweigh the evidence. Our colleagues in other states have taken a similar approach when faced with video evidence.
>
> We do not believe, however, as some of our colleagues in other jurisdictions do, that the very act of reviewing video evidence constitutes impermissible appellate reweighing. Rather, we consider video evidence admitted in the trial court to be a necessary part of the record on appeal, just like any other type of evidence.
>
> And just like any other type of evidence, video is subject to conflicting interpretations.…
>
> What is more, "the video record may 'speak for itself,' but it does not and cannot speak for the visual input a judge observes and

interprets that falls outside the scope of the camera, nor does it filter events and behavior through his or her experience and expertise." Bernadette Mary Donovan, Note, *Deference in A Digital Age: The Video Record and Appellate Review*, 96 Va. L. Rev. 643, 676 (2010). Although this statement was made in the context of a discussion of appellate consideration of video trial transcripts, we believe the same reasoning applies to appellate consideration of video evidence, and even to law enforcement reaction to an evolving situation. Deputy Claeys, as he drove down County Road 4 on that October night, was observing Robinson's vehicle through the lens of his experience and expertise. And when Deputy Claeys testified at the suppression hearing, the trial judge heard his testimony—along with the other witness testimony and evidence, including the video—through the lens of his experience and expertise. Ultimately, that experience and expertise led the trial judge to weigh Deputy Claeys's testimony more heavily than the video evidence, and we decline Robinson's invitation to substitute our own judgment for that of the trial court and rebalance the scales in her favor.

The trial court found, as a matter of fact, that to the extent Deputy Claeys's testimony conflicted with the video, the former was more reliable than the latter. Deputy Claeys testified "both passenger side tires were over the fog line" and "completely off the roadway" "twice." Thus, we must now decide whether those facts constitute reasonable suspicion for a traffic stop, as a matter of law, in accordance with our federal and state constitutions.

*Id*. at 365-67 (citations and footnotes omitted). The majority held that they did.

[26] Here, the relevant portions of Officer Kinyon's testimony regarding Burnell's traffic stop are largely consistent (or at least not inconsistent) with what the video shows. That being the case, is whether Burnell refused to take the chemical test a factual determination, which is entitled to deferential appellate

review, or a legal conclusion, which requires no deference? *See Woodcox v. State*, 30 N.E.3d 748, 750 (Ind. Ct. App. 2015) ("While we defer to the trial court's factual determinations, we review legal conclusions *de novo.*"). In other words, given that the relevant facts are essentially undisputed, are we in as good a position as the trial court to watch the video of the traffic stop and make our own determination regarding whether Burnell refused to take the chemical test? That remains an open question after *Robinson*, and I, for one, would welcome further clarification of the law in this area.

| | |
|---|---|
| Kristy Burnell,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | Court of Appeals Case No.<br>29A02-1412-CR-849 |

**Brown, Judge, dissenting.**

[27]   I respectfully dissent from the majority's conclusion that Burnell refused the chemical test.  As noted above, our task on review is to "determine whether the evidence is sufficient as a matter of law to support the finding[] that . . . the driver refused to submit to a chemical test offered by a law enforcement officer after being informed of the consequences of such refusal."  *Upchurch*, 839 N.E.2d at 1220.  Under Indiana's implied consent statute, Ind. Code § 9-30-6-1, "[a] person who operates a vehicle impliedly consents to submit to the chemical test provisions of this chapter as a condition of operating a vehicle in Indiana."  Today, the majority adopts a rule that "anything short of an unqualified, unequivocal assent to a properly offered chemical test constitutes a refusal" and holds that Burnell refused the test under the rule.  *Supra* at 10-11.

[28]     Burnell was severely intoxicated when she was asked by Officer Kinyon to submit to the chemical test, which she readily admitted to him would result in a finding that she was, in fact, intoxicated. Transcript at 24 ("Well, I mean if I take it, I'm going to jail."). Indeed, at the hearing the taped conversation of Officer Kinyon with the on-call prosecutor was played in which Officer Kinyon told the prosecutor that Burnell "PBT-ed at 2-9-5 with some -- with some of the worst field sobriety I've ever seen." *Id.* at 27. When asked to submit to the chemical test Burnell, who had been largely cooperative with Officer Kinyon by performing numerous field sobriety tests and submitting to a PBT, briefly considered her options, in which she remarked that regardless of whether she took the chemical test she was going to jail, and then answered: "So yeah, I guess I gotta take it." *Id.* at 24. At about the same time, and while flanked by Officer Kinyon and another officer, she took a step and was immediately restrained. Officer Kinyon told her that he was "going to take her refusal to answer [the] question as a refusal" and she was placed in handcuffs. *Id.* at 25.

[29]     The majority acknowledges that the facts presented here are distinguishable from those of the cases it discusses, noting that "the issue of equivocation alone when responding to an officer's request to take a chemical test" is an issue of first impression. *Supra* at 7. The facts of *Thacker* involved a man who twice verbally consented to take the chemical test, but when his legs were freed "he immediately became violent, kicking the officers and resisting their attempts to remove him from the patrol car" and the decision was made to not administer the test "because his violence constituted a threat to the examining equipment."

441 N.E.2d at 709. This court held that "recalcitrant behavior" such as Thacker's "which physically impedes or threatens to impede the administration of the test" constituted a refusal to submit to the test. *Id.* at 711.

[30] The *Thacker* court discussed the other cases relied upon by the majority, *Hatch* and *Davis*. *Id.* at 710. *Hatch* involved a driver who "took the mouthpiece to his mouth but would not blow into it with sufficient force to fill the sample capsule," and this court "treated the failure to give a suitable sample as a refusal to take the test." *Id.* The question in *Davis* was whether the right to counsel applied to Indiana's Implied Consent Law, in which this court held that "Davis had no constitutional right to consult with counsel prior to or during the taking of the test . . . ." *Id.* The court reasoned, citing to an opinion from the Superior court of New Jersey, Appellate Division, that "the remedial purpose of the statute, and the rapidity with which the passage of time and the physiological processes tend to eliminate evidence of ingested alcohol in the system" suggest that the statute be construed such that "anything substantially short of an unqualified, unequivocal assent to an officer's request that the arrested motorist take the test constitutes a refusal to do so. The occasion is not one for debate, maneuver or negotiation, but rather for a simple 'yes' or 'no' to the officer's request." *Id.* at 710-711 (quoting *Davis*, 174 Ind. App. at 437, 367 N.E.2d at 1166 (quoting *Pandoli*, 262 A.2d at 42)) (emphasis and brackets omitted).

[31] Unlike our previous cases, here there is no evidence that Burnell attempted to hinder Officer Kinyon's investigation into her state of intoxication by either physically resisting or feigning an attempt to perform the test, or otherwise

delay taking the test by requesting counsel. Faced with the question from Officer Kinyon, an intoxicated Burnell weighed her choices (and in doing so admitted that she was intoxicated) and, resigned to her fate, told him "I guess I gotta take it." Transcript at 24. I would find that Burnell's statement was not "*substantially* short of an unqualified, unequivocal assent," *Pandoli*, 262 A.2d at 42 (emphasis added), and that accordingly the evidence presented did not establish as a matter of law that she refused to submit to the chemical test under Ind. Code § 9-30-6-9(b). I would reverse the court's order on Burnell's petition for judicial review and reinstate her driving privileges.[2]

---

[2] Regarding Burnell's movements made at around the time she told Officer Kinyon "I guess I gotta take it," in reviewing the relevant portion of the video I observed Burnell facing Officer Kinyon with her hands in her pockets, and while she is stating "[w]ell if I refuse, I'm going to jail either way," she begins to rock backwards and takes a step or two in that direction. State's Exhibit 1 at Car 48, 20:49:18-23. She then begins to move forward and takes at most four small steps while stating "I guess I gotta take it," and Officer Kinyon, without moving his feet, grabs her by the arm, tells her "don't go anywhere," and she steps backward. *Id.* at 20:49:23-32. After Officer Kinyon lets go, she takes a step to the side while facing Officer Kinyon, and she is promptly grabbed by him and another officer, who is standing a few feet behind her, and placed in handcuffs. *Id.* at 20:49:32-52.

While I may not substitute my own review of this video evidence "for that of the trial court and rebalance the scales," *Robinson v. State*, 5 N.E.3d 362, 367 (Ind. 2014), I believe her movements to be immaterial because there is nothing in the record, and indeed the court does not find, that these steps were an attempt to elude the officers or otherwise create a delay in taking the test. The question presented here concerns "equivocation alone when responding to an officer's request to take a chemical test . . . ." *Supra* at 7. Also, despite the court's finding that Burnell "wouldn't stop interrupting" and "wanted to argue with" Officer Kinyon, and that she "kept referring to her uncle the police officer," Transcript at 32, as noted by the majority such conduct occurred only prior to Officer Kinyon's direction that he needed a yes or no answer, again to which Burnell responded by stating "I guess I gotta take it." *Id.* at 24.